PRIMROSE TAPESTRY CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 29451. Promulgated September 9, 1930.

*Theodore B. Benson, Esq.,* for the petitioner.

*James L. Backstrom, Esq.,* and *P. A. Sebastian, Esq.,* for the respondent.

OPINION.

VAN FOSSAN: The first issue is with respect to a rate to be used in computing the allowance for exhaustion, wear and tear of petitioner's machinery during the years 1920 and 1921.

In our opinion the evidence is not of sufficient weight or definiteness to overcome the presumption that the respondent's computation of the amounts referred to was correct.

The testimony with respect to the number of hours weekly the machinery was operated during the period in question is contradictory. On direct examination petitioner's treasurer, who was the only witness testifying concerning the condition of the machinery, stated that during all of the taxable years the petitioner's tapestry mill was operated regularly both day and night in two shifts of work, the day shift working 48 hours per week and the night shift working 44 hours per week. On cross-examination this witness

testified that the work of the mill during the taxable year was not done in two shifts, but that the mill was operated an average of 62 hours per week, namely 14 hours per week more than the regular working time fixed by union rule, and that this operation was accomplished by overtime work. The evidence shows that a majority of the machinery in use in 1920 was secondhand when bought by petitioner, but it does not appear how long this machinery had been in use when petitioner purchased it or its physical and mechanical condition at that time. Nor is there any evidence of the total cost of the secondhand machinery nor of the specific items comprising it. The treasurer testified that about 40 looms were owned and operated by petitioner at all times during the taxable years. Although it appears that 18 new looms and 2 secondhand looms, together with certain other new machinery and equipment, were purchased in 1921, because of the extension of the plant, there is no evidence from which it can be determined whether the 18 new looms and 2 secondhand looms were used with the 40 looms already in operation or whether some of the 40 looms were discarded at the time of the purchase of the new looms. The estimates of the useful life of the several types of machinery made by the petitioner's treasurer were largely in general terms. He testified that it was his opinion, growing out of his experience, that the average useful life of the various types of machinery used by the petitioner was ten years. There are in evidence only a few explicit and detailed figures by which the treasurer's estimate can be tested. There are figures from which it might be found that the average useful life of machines and equipment purchased in 1921 was 13 years, but not all the types of machines used by petitioner were included in the purchases made in 1921, and it appears that some of the machines not included in such purchase had an average useful life estimated at from 25 to 30 years.

Considering the evidence in relation to this issue as a whole, we can not say that the rate of 7½ per cent per annum used by the respondent for the determination of the allowance made for exhaustion, wear and tear of machinery is not a fair and reasonable rate.

Petitioner's claim that during the taxable years its income and capital were affected by abnormal conditions, within the provisions of section 327 of the Revenue Acts of 1918 and 1921, is based on the following grounds:

1. That the petitioner on its incorporation acquired the good will of the business founded by James Newton without payment therefor either in stock or by other valuable consideration and that this good will was a valuable asset not included in invested capital.

2. That during the taxable years the petitioner employed in its business relatively large amounts of borrowed money and that this borrowed money contributed to the production of taxable net income.

3. That because of the skilled services which petitioner's officers rendered, in addition to their ordinary duties as such officers, the petitioner was saved a very considerable amount of deductible expense for wages and that net income for the taxable years was thereby increased by the amount so saved.

The pertinent parts of section 327 of the Revenue Acts of 1918 and 1921 are as follows:

SEC. 327. That in the following cases the tax shall be determined as provided in section 328:

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

(d) Where upon application by the corporation the Commissioner finds and so declares of record that the tax if determined without benefit of this section would, owing to abnormal conditions affecting the capital or income of the corporation, work upon the corporation an exceptional hardship evidenced by gross disproportion between the tax computed without benefit of this section and the tax computed by reference to the representative corporations specified in section 328. This subdivision shall not apply to any case (1) in which the tax (computed without benefit of this section) is high merely because the corporation earned within the taxable year a high rate of profit upon a normal invested capital &ast; &ast; &ast;.

Since no stock was issued in exchange for the good will of the business acquired by petitioner from beneficiaries of the estate of James Newton, whatever value the good will had in 1920 and 1921 is necessarily excluded from invested capital under the provisions of section 306 of the Revenue Acts of 1918 and 1921. There is no proof of the value of the good will, nor of its relation either to invested capital or to the production of net income during the taxable years in question. It can not be said that statutory exclusion from invested capital of itself creates an abnormality giving rise to the right of special assessment within the provisions of sections 327 and 328 of the applicable revenue acts. *Morris & Co.*, 1 B. T. A. 704; *Clarence Whitman & Sons, Inc.*, 11 B. T. A. 1192; *W. E. Beckmann Bakers' & Confectioners' Supply Co.*, 13 B. T. A. 860.

Nor do we consider that petitioner's use of borrowed money during the taxable years created an abnormality within the provisions of the statute. In the beginning of the year 1920 petitioner owed $19,800 for borrowed money. In that year it borrowed $48,600 additional; it paid off some of its borrowings and at the end of the year its balance sheet contained among the stated liabilities the sum of $33,000 on account of notes payable. In 1921 petitioner borrowed $55,100 and at the end of that year it owed $22,000 on account of notes payable. During the two years petitioner's gross sales were rapidly increasing, amounting to $331,631.58 in 1920 and to $596,989.16 in 1921. Petitioner's invested capital at the beginning

of 1920 was $43,910.58 and its net income for the year was $22,033.49. At the beginning of 1921 its invested capital was $65,046.72 and its net income for that year was $76,866.18. It does not appear from any proof in the record that it was not customary and normal for concerns engaged in business similar to that of petitioner to borrow considerable sums of money to finance their operation. What is abnormal can be determined only by reference to what is normal. On this principle we have consistently held that the use of borrowed capital is not in itself evidence of an abnormality, but that the claimed abnormality must be established clearly by the proof. *Higginbotham-Bailey-Logan Co.*, 8 B. T. A. 566; *C. A. Dahl Co.*, 10 B. T. A. 915; *Iron City Electric Co.*, 13 B. T. A. 286; *Clark Brown Grain Co.*, 18 B. T. A. 937.

The salaries paid to petitioner's officers amounted to the total sum of $10,370.72 in 1920 and to the total sum of $13,041.28 in 1921. The petitioner does not claim that the amounts of salaries were inadequate payment for the performance by the officers of the duties usually pertaining to their respective offices. But petitioner argues in effect that its officers performed skilled labor for which they were not paid and that the special skilled work done by them, as stated in the findings of fact, effected a saving of comparatively large amounts which otherwise petitioner would have had to pay as salary and wages to skilled employees. It is claimed that this saving is reflected in the net income of the taxable years and that the condition created thereby is abnormal.

It is not unusual for the officers of a corporation to endeavor to save expenses of operation wherever and however such saving may be made without curtailing efficiency of operation. Curtailment of expenditure in any business might be reflected in profit, if the business shows a profit. The fact that the training and experience of petitioner's officers enabled them to make a saving in petitioner's salary and wages account did not create a condition with respect to net income essentially different in character from that which any wise saving in other operating expense would have created. And, in the last analysis, it must be considered that the salaries paid to the officers were payment for all services performed by them of whatever nature. It may be that the salaries paid were inadequate, judged from the point of view of total services rendered by the officers of the petitioner. We have held, however, that mere inadequacy of salary does not, of itself, create abnormality. *United Shoe Stores Co.*, 2 B. T. A. 73; *Eagle Piece Dye Works*, 10 B. T. A. 1360. Moreover, the aggregate of a number of conditions, each inadequate in itself, does not necessarily constitute a basis for special assessment.

For the reasons stated we are of the opinion that petitioner is not entitled to special assessment under the provisions of sections 327 and 328 of the Revenue Acts of 1918 and 1921.

*Decision will be entered for the respondent.*